## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA ANN M. DANNER, | | No. 4:20-CV-00675 |
| Plaintiff, | | (Chief Judge Brann) |
| v. | | |
| MERRICK GARLAND, ATTORNEY GENERAL, *et al.*, | | |
| Defendants. | | |

## MEMORANDUM OPINION

### MAY 19, 2023

Plaintiff Theresa Danner has sued her former employer, the Federal Bureau of Prisons, as well as the Attorney General of the United States and the Department of Justice, alleging sexual discrimination and retaliation. According to Danner, she experienced harassment and a hostile work environment and then suffered reprisals for reporting the offending conduct: a supervisor propositioned her via text message on a work trip and she was then subjected to unwarranted investigations, unjustly penalized in her performance evaluations, and ignored by various Human Resources and psychology personnel. These allegations, if true, would be distressing. But the evidence does not support Danner's claims. Moreover, the suit itself is untimely. Accordingly, the Court grants summary judgment in favor of the Defendants.

## I.    BACKGROUND

### A.    Factual Background

From May 2010 until her retirement in October 2016, Danner worked for the Federal Bureau of Prisons ("BOP") as a GS-8, Special Investigative Services Technician at the United States Penitentiary Lewisburg in Lewisburg, Pennsylvania ("USP-Lewisburg").[1] Danner had several immediate supervisors, including her Special Investigative Supervisor, Lieutenant Daniel Knapp.[2] And both Danner and Lt. Knapp reported directly to Special Investigative Agents ("SIAs") Suzanne Heath and James Fosnot.[3]

According to Danner, starting with an incident involving Lt. Knapp in August 2015, she experienced discrimination, harassment, retaliation, and a hostile work environment at the hands of USP-Lewisburg officials until she retired the following October.[4] A summary of the relevant events follows.

### 1.    Incident in Las Vegas

In early August 2015, Danner and Lt. Knapp were in Las Vegas, Nevada for a week-long, work-related training event.[5] On the night of August 11, Lt. Knapp

---

[1]    Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 22, 31.

[2]    *Id*. at 22.

[3]    *Id*.; *see also* Doc. 26-14 (May 17, 2016, S. Heath Interview Tr.) at 229:6–25; Doc. 26-15 (May 16, 2016, J. Fosnot Interview Tr.) at 268:1–15, 269:8–19**.**

[4]    *See* Doc. 29 (Danner Statement of Material Facts).

[5]    Doc. 26-8 (Mar. 23, 2016, T. Danner Interview Tr.) at 90:10–91:14.

sent Danner several suggestive text messages, asking her if she wanted to have a "night cap."[6] Danner declined this offer.[7]

According to Danner, she considered the messages "hostile and abusive."[8] That said, she did not "inform or complain" to Lt. Knapp that she felt uncomfortable and considered the messages "sexual harassment," and likewise did not immediately raise the issue with any other "management official" at USP-Lewisburg.[9]

### 2.      Investigations into Danner's Workplace Conduct

Around the same time, BOP officials at USP-Lewisburg conducted two separate investigations into Danner's conduct at the prison.

First, Danner alleges that she was investigated for "having a sexual relationship" with one of her co-workers.[10] Specifically, while Danner was at the training event in Las Vegas, BOP staff members went into Danner's office to "look for a video that [Danner] was supposed to have given" to either the legal department or disciplinary hearing department at USP-Lewisburg "prior to her leaving for [the] training."[11] The BOP employees searching for the video came across a notebook in Danner's office that included discussions "about having sex at

---

6   *Id*.; *see also* Doc. 26-9 (August 11, 2015, Danner-Knapp Text Exchange) at 115**.**
7   *Id*.
8   Doc. 30 (Danner Opp.) at 14.
9   Doc. 26-8 (Mar. 23, 2016, T. Danner Interview Tr.) at 91:4–20.
10  Doc. 26-7 (Sept. 11, 2015, T. Danner Letter to USP-Lewisburg Human Resources) at 40.
11  Doc. 26-26 (May 17, 2018, A. Hartman Interview Tr.) at 186:6–14.

work and giving oral sex."[12] The writing in the notebook was "in [Danner's]

handwriting and somebody else's"—whether "an inmate" or "a staff member," it

"was not known."[13]

Because the BOP employees' supervisor was away from the prison

(incidentally, at the training in Las Vegas with Danner), they reported the notebook

to the Associate Warden at USP-Lewisburg.[14] The Associate Warden directed the

BOP employees to report the notebook to their supervisor when he or she returned

from the Las Vegas training and, in the meantime, to "check some video footage"

at the prison from the weekend prior to the Las Vegas trip to determine why

Danner was at the facility those days.[15] No further action was taken:

USP-Lewisburg staff did not conduct a formal investigation into, or make a referral

to the BOP's Office of Internal Affairs or Office of the Inspector General

regarding, whether Danner engaged in a sexual relationship with a co-worker.[16]

---

[12]  *Id*. at 186:14–20.

[13]  *Id*. at 187:6–18.

[14]  *Id*. at 186:20–187:6.

[15]  *Id*. at 187:6–18; *see also* Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 100:7–102:4 (explaining how the Associate Warden "had given the [BOP employees] consent to—to see why [Danner] was in the institution, what she was doing. So I came in to review the video footage and that following Monday I asked [Danner] for a memo on why she was in this institution because some of the exec[utive] staff wanted to know why my [supervisee] was in the institution from 10:30 to 1:00").

[16]  *See* Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 104:22–105:9 (explaining "there was no investigation [into Danner] for having sex with a co-worker" and there was no "referral for one"); *see also* Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 77 ("21. Did you refer [Danner] for an internal investigation accusing her of having a sexual relationship with a co-worker as alleged? A. No.").

Second, USP-Lewisburg staff investigated allegations that Danner allowed inmates who were forbidden by policy from interacting with each other to be in an office together without any physical restraints.[17] On September 3, 2015, after learning about Danner's alleged violation, the USP-Lewisburg Warden and executive staff reassigned Danner to the facility's Command Center.[18] According to SIA Fosnot—Danner's supervisor at the time—the Warden and executive staff "did not want [Danner] around inmates" until after an investigation was completed and they "figure[d] out what was going on."[19] To that end, the Warden, David Ebbert, referred Danner to the BOP's Office of Inspector General for an internal investigation.[20]

### 3.   Initial Complaint of Harassment

On September 11, 2015, Danner sent a memorandum to USP-Lewisburg's Assistant Human Resources Manager, Regina Moscarello, titled "Harassment/Hostile Work Environment."[21] In the memo, Danner reported

---

[17]   *See* Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 105:12–21 ("[Q.] Did you reassign [Danner] to the Command Center on time out and deliberate idling on September 3, 2015, as alleged? [A.] She was reassigned by the Warden and the executive staff, yes. [Q.] If so, why was she reassigned? [A.] Until we—the investigation has happened, there was an alleged involvement with inmates, and until we could figure out what was going on we did not want her around inmates."); *see also* Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 78 ("32. When did you assign [Danner] to the Command Center and for how long? A. When it was alleged she violated policy and allowed inmates from different Special Management Unit (SMU) phases to interact. These inmates were allegedly unrestrained. That was September 3, 2015.").

[18]   *See* Doc. 26-17 (Sept. 3, 2015, Notification of Change in Work Assignment).

[19]   Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 105:12–21.

[20]   Doc. 26-21 (D. Ebbert Affidavit by Interrogatory) at 80.

[21]   Doc. 26-7 (Sept. 11, 2015, T. Danner Letter to USP-Lewisburg Human Resources).

"in-house harassment she was being subjected to,"[22] highlighting both the investigation into her alleged sexual relationship with a co-worker and the subsequent investigation into the incident with inmates who were prohibited from interacting with one another.[23] Danner noted "how ironic it was that in [her] first [fifteen] years in the Bureau [she had] never been under investigation [and] now there have been [two] in a few weeks of each other."[24] She described feeling "railroaded."[25] She did not, however, mention anything about the unsolicited and unwanted text messages from Lt. Knapp.[26]

### 4.   Negative Performance Evaluations

The following week, on September 18, 2015, Danner received employee performance ratings from SIA Heath.[27] In addition to two "Successful" ratings and one "Excellent" rating, Danner received three "Minimally Satisfactory" ratings (the second lowest possible rating, above only "Unsatisfactory").[28] Danner's

---

[22]   Doc. 1 (Compl.) ¶ 28; *see also* Doc. 29 (Danner Statement of Material Facts) ¶ 15 ("[Danner] reported the in-house harassment and hostile work environment to Human Resources on September 11, 2015.").

[23]   Doc. 26-7 (Sept. 11, 2015, T. Danner Letter to USP-Lewisburg Human Resources).

[24]   *Id*. at 42–43.

[25]   *Id*. at 43.

[26]   *See id*.

[27]   *See* Doc. 26-11 (Sept. 18, 2015, T. Danner Employee Evaluation).

[28]   *Id*.; *see also* Doc. 26-12 (Oct. 3, 2014, T. Danner Annual Performance Review) (detailing the "Element Rating Scale" for employee performance, which outlines five possible ratings: (1) Outstanding, (2) Excellent, (3) Achieved Results, (4) Minimally Satisfactory, and (5) Unsatisfactory).

employee performance evaluation form provides the following explanation for her

"Minimally Satisfactory" ratings:

> On September 9, 2015, [SIA Heath] discovered you were not placing Use of Force Videos and incident videos (evidence) into an SIS safe or evidence vault as required by P1380.05. This is a Vital function. Instead, these pieces of evidence were found in your office not properly stored. Furthermore, these videos did not have an evidence recovery log loaded into TRUINTEL, also required. You were responsible for ensuring this vital function was completed.[29]

Danner asserts that she received the "Minimally Satisfactory" ratings

"because [she] complained about her office."[30] SIA Heath has disputed this.[31]

According to SIA Heath, when she issued Danner the "Minimally Satisfactory"

ratings for failing to store and log Use of Force and incident videos, she was not

aware of Danner's September 11, 2015, memorandum to Human Resources.[32]

Instead, SIA Heath emphasized that she issued the "Minimally Satisfactory"

---

[29]  Doc. 26-11 (Sept. 18, 2015, T. Danner Employee Evaluation) at 148–50.

[30]  Doc. 29 (Danner Statement of Material Facts) ¶ 20.

[31]  *See* Doc. 26-14 (May 17, 2016, S. Heath Interview Tr.) at 237:19–25 ("[Q.] Do you agree or disagree with [Danner's] claim that she was discriminated against based on her sex (female) and reprisal when on September 18, 2015, her quarterly evaluation was lowered because she reported the harassment and hostile work environment to management? [A.] Absolutely not.").

[32]  *See id.* at 236:24–237:13 ("[Q.] Did [Danner] inform you or complain to you that on September 11, 2015, she reported the harassment and hostile work environment to management? [A.] No. [Q.] Did anyone in [Danner's] work group or outside the work group inform you [Danner] felt she was in a hostile work environment when she reported to management on September 11, 2015? [A.] No. [Q.] Okay. Was the Agency aware of [Danner's] claim that she reported the harassment and hostile work environment to management on September 11, 2015? [A.] I have no idea what the date was.").

ratings because Danner "flat out wasn't doing her job that she's required to do," describing Danner's actions as an "egregious failure."[33]

Danner offers no evidence establishing that SIA Heath was aware of the September 11, 2015 memorandum when she issued the "Minimally Satisfactory" ratings.[34] She likewise has not refuted the substance of the criticism underlying the poor performance evaluation.[35]

Moreover, there is no indication that the "Minimally Satisfactory" ratings had any effect on her compensation or employment status. Indeed, despite the negative performance reviews, Danner received an "Outstanding" rating—the highest possible rating—for the full year 2015.[36]

### 5.  Equal Employment Opportunity Complaint

On September 23, 2015, Danner filed a complaint with the BOP's Equal Employment Opportunity ("EEO") Program, asserting "[r]eprisal for reporting harassment / hostile work environment on September 11, 2015."[37] When asked to "describe what happened," Danner noted that "SIA Heath provided me with [three 'Minimally Satisfactory' ratings] for my quarterly evaluation."[38] Separately, Danner wrote that "[o]n August 11, 2015, while on training I received sexually

---

[33]  *Id*. at 232:5–20, 237:17–18.
[34]  *See* Doc. 29 (Danner Statement of Material Facts).
[35]  *Id*.
[36]  *See* Doc. 26-16 (USP Lewisburg SIS Technician Ratings for 2015).
[37]  Doc. 26-6 (Sept. 23, 2015, T. Danner Request for EEO Counseling) at 25.
[38]  *Id*. at 26.

harassing texts from Lt. Daniel Knapp."[39] This was the first time that Danner reported the incident involving Lt. Knapp to officials with the BOP.[40]

### 6.    Alleged Retaliation

According to Danner, after she filed the EEO Complaint, various BOP officials at USP-Lewisburg retaliated against her.

First, Danner asserts that the prison's Human Resources staff refused to respond to her September 11, 2015, memo, noting that "no one in Human Resources would answer the phone from any of the extensions in the [C]ommand [C]enter" and that they similarly "repeatedly ignore[d] [her] emails."[41] Regina Moscarello, the Assistant Human Resource Manager at USP-Lewisburg who received the September 11, 2015, memo, denied this allegation.[42] According to Ms. Moscarello, she and Danner had multiple conversations before Danner filed the memo, including a discussion "about the claim [Danner] wanted to make and on how to make it," and that she informed Danner that "once [she] received [Danner's] official written information," she would "have [the] claim[] reviewed," but that their "discussions would be limited."[43] That said, Ms. Moscarello stated

---

[39]  *Id*.

[40]  *See* Doc. 26-8 (Mar. 23, 2016, T. Danner Interview Tr.) at 95:7–10.

[41]  Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 34; *see also* Doc. 29 (Danner Statement of Material Facts) ¶ 26 ("[The] Assistant Human Resource Manager at USP Lewisburg, Regina Moscarello, refused to assist [Danner] after becoming aware of [Danner's] situation.").

[42]  *See* Doc. 26-25 (R. Moscarello Affidavit by Interrogatory) at 156–58.

[43]  *Id*. at 157; *see also* Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 34 ("But, after I sent the [September 11, 2015] memorandum to [Ms. Moscarello] I tried contacting her again and

that she "later contacted [Danner] by phone" and "informed her that since she was already removed from the individuals she made a claim against, and she had no e-mail contact with [those] individuals, there was nothing else [USP-Lewisburg] Management needed to do at the time."[44]

Second, Danner claims that although she was referred to a BOP Chief Psychologist through the Employee Assistance Program, the Chief Psychologist "never contacted [her] or even approached [her] when, once a month, his team would meet in the Command Center where [she] was assigned."[45] In an Affidavit by Interrogatory addressing her concerns, Danner did not attribute the lack of response to her initial complaint of harassment on August 11 or her September 23 EEO Complaint; instead, she stated, "I believe I was just not important enough for him to deal with," postulating that "[m]aybe [the Chief Psychologist] just didn't think a female needed the help."[46]

Third, Danner contends that her new supervisor in the prison's Command Center, Emergency Preparedness Officer Lynn Hunter, gave her the "cold

all she would say was because of her position as the Human Resources Assistant Manager, now that I have read the memo I cannot talk about it with you, you understand.").

[44] Doc. 26-25 (R. Moscarello Affidavit by Interrogatory) at 157.

[45] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 36. In her EEO Complaint, Danner stated that Emergency Preparedness Officer Lynn Hunter reached out to the Chief Psychologist on September 11, 2015. *Id*. But in her Statement of Material Facts, Danner refers only to a "referral by former Captain at USP Lewisburg, Brent Traggard[,] on September 3, 2015." Doc. 29 (Danner Statement of Material Facts) ¶ 28 (citing Doc. 26-18 (Sept. 3, 2015, B. Taggart Referral to EAP for T. Danner)).

[46] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 36.

10

shoulder" and "refused to speak to [her]."[47] According to Danner, this began "not long after [a BOP official] came . . . to interview [her] in regards to the sexual harassment [she] had filed on Lieutenant Knapp."[48] In her Affidavit by Interrogatory, Danner explained that she "strongly [felt] after [Officer Hunter] heard [she] filed Sexual Harassment against Lieutenant Knapp he was either warned or chose to on his own have limited contact with [her]," to ensure that Danner "couldn't turn around and file it on him also."[49] For his part, Officer Hunter expressed confusion about the allegation, stating that he "talked to [Danner] every day" when opening and closing the Command Center, and that to the extent those conversations were limited, it was because his office was located in a different part of the prison complex.[50]

---

[47]  Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 42; *see also* Doc. 29 (Danner Statement of Material Facts) ¶ 30 ("Mr. Hunter purposely ignored her at work, and gave her the 'cold shoulder' for [four] months.").

[48]  Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 42.

[49]  *Id.*

[50]  Doc. 26-24 (May 16, 2018, L. Hunter Interview Tr.) 144:5–23 ("[Q.] Issue 7, her supervisor giving her the cold shoulder and refusing to speak to her for four months. Did you give her the cold shoulder and refuse to speak to [Danner] for four months as alleged? [A.] She's talking about me? [Q.] Yes, sir. [A.] I talked to her every day. I left [sic] her in, I left [sic] her out, I spoke to her, I said good morning to her, said goodbye to her every afternoon, and that's all— all I've really talked to her. I don't work at the Command Center. I went in there in the morning and opened it up, let her in there, and I have an outside office there that I don't really go into, and then I come into the institution, I spend the day there, I left and came out at 2:30, let her out, locked the door because she didn't have a key, and I came back inside and finished my day, so I don't know how I would give her the cold shoulder when I don't even work there. My office is inside.").

Fourth, Danner asserts that in June 2016, SIA Heath refused to provide her with, and allow her to sign, her 2016 annual evaluation.[51] Asked why she considered this action "discrimination and harassment based on [her] sex and reprisal," Danner responded, "Because they knew by this point in time they had no case on me. No one wanted to come face to face with me. . . . Everyone was trying to make things as difficult for me as possible to make me quit so they wouldn't have to say they were wrong."[52]

Similar to Officer Hunter with the third complaint, SIA Heath seemed confused by the allegation. When asked whether she refused to "show [Danner] her 2016 annual evaluation or give her a chance to sign it as alleged," SIA Heath responded, "I was in charge of doing her evaluations during this time period. Her yearly evaluation would've been due in April of 2017 and I was retired in January."[53] SIA Heath stated that to the extent Danner was referring to her quarterly evaluations, "[E]very quarter I would go out to the Command Center where [Danner] was temporarily reassigned and show [Danner] her quarterly evaluation and ask her if she wanted to sign it, and she would refuse every time."[54]

---

[51] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 46; *see also* Doc. 29 (Danner Statement of Material Facts) ¶ 33 ("[Danner's] supervisor, Susan Heath, refused to allow her to see or sign her June 2016 evaluation.").
[52] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 46.
[53] Doc. 26-23 (May 18, 2018, S. Heath Interview Tr.) at 127:11–17.
[54] *Id.* at 127:18–128:2.

And fifth, Danner alleges that in October 2016, during her last full week at work, she overheard various male colleagues "being extremely crude in their language" and making sexual remarks that she believes were directed at her.[55] Danner acknowledges that she did not report these remarks to USP-Lewisburg management.[56] According to Danner, "there was no one to report this to[]" because "[t]here were Lieutenants in the room . . . and the responsibility should have fallen on them to correct the actions and words of the team members under their command."[57]

### 7.    Investigation Results and Recommendation

During this period, the BOP's Office of Inspector General completed its investigation into the allegations that Danner violated BOP policy by allowing inmates prohibited from interacting with one another to be together in a room without restraints.[58] According to the USP-Lewisburg Warden, David Ebbert, the Office of Inspector General ultimately sustained the charges and recommended Danner's termination, but Danner "accepted a disability retirement prior to [that] decision."[59]

---

[55] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 44–45; *see also* Doc. 29 (Danner Statement of Material Facts) ¶ 31.
[56] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 45.
[57] *Id.*
[58] Doc. 26-21 (D. Ebbert Affidavit by Interrogatory) at 80.
[59] *Id.*

For her part, Danner states only that "doctors pulled [her] out on October 31, 2016," because her "blood pressure was extremely high and [she] was also experiencing suicidal ideations."[60] She claims that "had [she] not been pulled out" by her doctors, she is "sure [she] would still be sitting there waiting on the outcome and [the] Warden's decision."[61] She has not, however, offered evidence refuting Warden Ebbert's assertion that the Office of Inspector General sustained the allegations against her and issued a proposal for removal.

## B.   Procedural History

After receiving Danner's EEO Complaint, the Equal Employment Opportunity Commission ("EEOC") opened an investigation into the matter.[62] Ultimately, the EEOC determined that Danner "failed to set forth the intentional discrimination required to make a finding of discrimination in this case."[63] On October 11, 2019, the Department of Justice's Complaint Adjudication Officer accepted the EEOC's decision,[64] and then sent Danner and her attorney notice of her right to sue in federal court.[65] Specifically, a copy of the decision and so-called

---

[60]   Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 31.
[61]   *Id.*
[62]   *See* Doc. 26-2 (Oct. 11, 2019, Right-to-Sue Letter) at 9–15 (EEOC Decision).
[63]   *Id.* at 15 (EEOC Decision).
[64]   *Id.* at 6–7 (Dept. of Justice Memo Explaining the Final Order).
[65]   *See id.* at 1–2.

"right-to-sue" letter was emailed to both Danner and her attorney, and a physical copy was mailed to Danner.[66]

On April 20, 2020, Danner initiated the instant action.[67] Her Complaint presents two causes of action: sexual discrimination (Count I) and retaliation (Count II).[68]

The Defendants filed a motion for summary judgment on November 30, 2022.[69] That motion has been fully briefed and is now ripe for disposition.[70]

## II.   LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[71] Material facts are those "that could alter the outcome" of the litigation, and disputes are "genuine" if "evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[72] A defendant "meets this standard when there is an absence of evidence that rationally supports

---

[66]   *See* Doc. 26-3 (Oct. 11, 2019, EEOC Email) (sent to Danner at "tadanner@gmail.com" and her attorney, Christian Lovecchio at "christine@rcrglaw.com"); Doc. 26-4 (USPS Certified Mail Receipt – Oct. 11, 2019, delivery to T. Danner).

[67]   *See* Doc. 1 (Compl.).

[68]   *Id*. at ¶¶ 41–48 (Count I), 49–59 (Count II).

[69]   Doc. 19 (Defs' MSJ).

[70]   *See* Doc. 24 (Defs' Br.); Doc. 30 (Danner Opp.); Doc. 31 (Defs' Reply).

[71]   Fed. R. Civ. P. 56(a).

[72]   *EBC, Inc. v. Clark Building Systems, Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (citing *Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

the plaintiff's case."[73] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[74]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[75] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[76] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[77] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[78]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[79] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[80] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by

---

[73] *Clark*, 9 F.3d at 326.

[74] *Id*.

[75] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[76] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[77] *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[78] *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (citation omitted).

[79] *Liberty Lobby*, 477 U.S. at 252 (internal quotation marks, citation, and brackets omitted).

[80] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[81] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[82]

## III.   ANALYSIS

The Defendants, in the instant motion, argue that summary judgment is proper because Danner's claims are both untimely and without merit. For the reasons provided below, the Court agrees.

### A.   Statute of Limitations

Under Title VII, an individual seeking renumeration for alleged employment discrimination must exhaust her claims before the Equal Employment Opportunity Commission ("EEOC") prior to filing suit in federal court.[83] To that end, if the complainant files a discrimination claim with the EEOC but the EEOC declines to pursue it, the EEOC must notify the complainant, which it typically does by issuing a "right-to-sue" letter.[84] After receiving the right-to-sue letter, the complainant has ninety (90) days to bring her civil suit in federal court.[85] The ninety-day period for filing the civil action is treated as a statute of limitations,

---

[81]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[82]   Fed. R. Civ. P. 56(c)(3).

[83]   *See* 42 U.S.C. § 2000e-5(f)(1); *see also Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001) (noting that Title VII "establish[es] administrative remedies and procedures that claimants must exhaust prior to bringing a civil action in court").

[84]   *Burgh*, 251 F.3d at 470.

[85]   *See McGovern v. City of Philadelphia*, 554 F.3d 114, 115 n.1 (3d Cir. 2009) ("A claimant is required to file a Title VII suit within 90 days of receiving a Right to Sue Letter.").

which the Third Circuit has "strictly construed," meaning that "in the absence of

some equitable basis for tolling, a civil suit filed even one day late is time-barred

and may be dismissed."[86]

Under this administrative regime, "the date on which [a claimant] receive[s]

the [right-to-sue] letter becomes critical."[87] The Third Circuit instructs that unless

evidence shows differently, "courts will presume that a plaintiff received her

right-to-sue letter three days after the EEOC mailed it."[88]

Here, the EEOC issued a written decision concluding that the administrative

record did not support a finding of discrimination or harassment against Danner on

the basis of her sex or EEO activity,[89] which the Department of Justice's

Complaint Adjudication Officer accepted on October 11, 2019.[90] That same day,

the Complaint Adjudication Office sent Danner and her attorney the decision and

right-to-sue letter via email,[91] and also mailed the documents to Danner via United

States Postal Service certified mail.[92]

---

[86] *Burgh*, 251 F.3d at 470.

[87] *Seitzinger v. Reading Hospital and Medical Center*, 165 F.3d 236, 239 (3d Cir. 1999).

[88] *Id*.

[89] *See* Doc. 26-2 (Oct. 11, 2019, Right-to-Sue Letter) at 9–15 (the EEOC's decision finding that Danner "failed to show that the alleged harassment was sufficiently severe and/or pervasive to alter the conditions of employment and create an abusive atmosphere and/or that the alleged harassment based on her protected class," and further, the BOP "articulated legitimate, non-discriminatory reasons for the employment actions" that Danner "failed to refute").

[90] *Id*. at 5.

[91] *See* Doc. 26-3 (Oct. 11, 2019, EEOC Email) (sent to Danner at "tadanner@gmail.com" and her attorney, Christian Lovecchio at "christine@rcrglaw.com").

[92] *See* Doc. 26-4 (USPS Certified Mail Receipt – Oct. 11, 2019, delivery to T. Danner).

Because the parties have produced no evidence to the contrary, the Court presumes that Danner received her right-to-sue letter no later than October 14, 2019.[93] Accordingly, Danner had until January 13, 2020, to bring this suit. But she did not file her Complaint until April 20, 2020—189 days after receiving the right-to-sue letter.[94] That means her suit is 99 days late.

Curiously, although she filed a 21-page opposition brief and therein acknowledges the Defendants' argument that her claims should be dismissed as untimely, she offers no response.[95] No explanation for the delay. No argument for equitable tolling. Nothing. Like a sailor fighting to plug a hole in her boat while ignoring a rapidly approaching 100-foot wave, Danner contests the Defendants' substantive arguments but leaves unanswered the dispositive question about the timeliness of her Complaint.

Because Danner failed to initiate this suit within the ninety-day filing period, her claims cannot proceed. Summary judgment is appropriate on this basis alone.

**B.      Substantive Claims**

Even if Danner's claims were timely, summary judgment would still be appropriate, as the claims are without merit.

---

[93]   *See Seitzinger*, 165 F.3d at 239.

[94]   *See* Doc. 1 (Compl.).

[95]   *See* Doc. 30 (Danner Opp.) at 1 (noting the Defendants' "QUESTIONS PRESENTED," which includes the following: "Whether the Court should grant summary judgment because the Complaint was filed beyond the statute of limitations set forth in 42 U.S.C. 2000e-5(f)(1)?"), 10–20 (Danner's "LEGAL ARGUMENT" section, silent on the timeliness issue).

In her Complaint, Danner advances two separate causes of action: sexual discrimination (Count I) and retaliation (Count II).[96] Although the Complaint details a series of events from August 2015 to October 2016 that serve as the factual predicates for Danner's claims, it is unclear from the Complaint which events pertain to each count and, for Count I, what theory of discrimination they purportedly support.[97] Danner's Opposition Brief likewise provides little clarity— she organizes the case into four separate theories of liability without reference to either count.[98]

As best as the Court can tell, Count I rests on three distinct theories of liability: (a) disparate treatment, based on Danner's transfer to the Command Center following the inmate incident; (b) *quid pro quo* sexual harassment, based on the text messages she received from Lt. Knapp while at the training in Las Vegas; and (c) hostile work environment, based on various alleged events considered in conjunction with one another.[99] Separately, Count II asserts retaliation related to

---

[96]   *See* Doc. 1 (Compl.) ¶¶ 41–48 (Count I: alleging that the Defendants "discriminated against [her] in the terms, conditions, and privileges of employment in various ways in substantial part because of her sex and reporting of illegal harassment and discrimination related thereto," and that this "sex discrimination created an intimidating, oppressive and hostile and offensive work environment"), 49–59 (Count II: alleging that the Defendants "retaliated against [her] by . . . subject[ing] [her] to unjust scrutiny, false allegations of misconduct, and unwelcomed and discriminatory comments solely because [she] reported as required to do so the illegal and improper activities of a Complex Supervisor").

[97]   *See id*. ¶¶ 4–40.

[98]   *See* Doc. 30 (Danner Opp.) at 10–20.

[99]   *Id*. at 10–12, 14–17.

Danner's September 2015 EEO Complaint.[100] The Court addresses each theory of

liability in turn.

### 1.    Sexual Discrimination (Count I)

### a.    Disparate Treatment

When analyzing disparate treatment sex discrimination claims under

Title VII, courts apply the burden-shifting analysis outlined by the Supreme Court

of the United States in *McDonnell Douglas Corp. v. Green*.[101] Under this analysis,

the plaintiff "bears the initial burden of establishing a *prima facie* case by a

preponderance of the evidence."[102] To satisfy this burden, the plaintiff must show

the following: (1) she was a member of a protected class; (2) she was performing

her job satisfactorily; (3) she suffered an adverse employment action; and

(4) similarly situated employees of the opposite sex were treated more favorably.[103]

If the plaintiff makes a *prima facie* case, the burden then shifts to the

employer to "articulate some legitimate, nondiscriminatory reason for the [adverse

employment action]."[104] Specifically, the employer must "clearly set forth, through

the introduction of admissible evidence, reasons for its actions which, if believed

---

[100]  *Id.* at 13.
[101]  411 U.S. 792, 802 (1973).
[102]  *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).
[103]  *See Summy-Long v. Pennsylvania State University*, 226 F. Supp. 3d 371, 395 (M.D. Pa. 2016), *aff'd*, 715 F. App'x 179 (3d Cir. 2017).
[104]  *Sarullo*, 352 F.3d 797 (citing *McDonnell Douglas*, 411 U.S. at 802).

by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."[105]

If the defendant meets this burden, "the presumption of discriminatory action raised by the *prima facie* case is rebutted" and the burden shifts back to the plaintiff.[106] To sustain the claim, "[t]he plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action."[107] Specifically, the plaintiff must "provid[e] evidence that would allow a fact finder reasonably to (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action."[108]

Here, Danner asserts that "management at USP-Lewisburg treated her differently" than similarly situated male colleagues when it opened "an administrative case investigation" based on "an incident in which inmates were uncuffed and mingled with other inmates from other 'phases.'"[109] According to Danner, "[t]wo male officers"—a corrections officer named Justin Romig and a counselor named Matt Edinger—"were present during the incident"; Counselor

---

[105] *St. Mary's Honor Center*, 509 U.S. at 507 (internal quotation marks and emphasis omitted).
[106] *Sarullo*, 352 F.3d at 797 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).
[107] *Id.*
[108] *Id.* at 800 (internal quotation marks and citation omitted).
[109] Doc. 30 (Danner Opp.) at 10–11.

Edinger purportedly "admitted to uncuffing the inmates" before "he and Officer Romig left the room," while Danner "remained in the room for precautionary reasons."[110] Danner asserts that neither Counselor Edinger nor Officer Romig were investigated, whereas she "was questioned by [Office of Inspector General] agents and remained under investigation for [fourteen] months and placed on 'time out,'" before ultimately being "recommended for termination."[111]

But Danner fails to establish a *prima facie* case for two reasons, both related to the final element (i.e., similarly situated employees treated more favorably).[112] First, she provides no factual support for her account of events. Danner's Statement of Material Facts makes no mention of either Counselor Edinger or Officer Romig and contains no description of the incident at issue.[113] And the documentary evidence the parties cite when discussing the incident and subsequent investigation likewise contains no information on the specifics of the incident or those involved.[114] Indeed, Counselor Edinger and Officer Romig appear only in Danner's Opposition Brief.

---

[110] *Id.* (citing Doc. 29 (Danner's Statement of Material Facts) ¶ 26).

[111] *Id.*

[112] For purposes of their motion, the Defendants "assum[e] . . . that the investigation and reassignment are adverse employment actions." Doc. 24 (Defs' Br.) at 13. The Court does the same.

[113] *See* Doc. 30 (Danner Statement of Material Facts).

[114] *See* Doc. 26-17 (Sept. 3, 2015, Notification of Change in Work Assignment); Doc. 26-20 (T. Danner Affidavit by Interrogatory); Doc. 26-21 (D. Ebert Affidavit by Interrogatory).

Second, even if the Court did credit Danner's account of events, it's not clear that Counselor Edinger and Officer Romig are appropriate comparators. The men both held different positions than Danner (she was a Special Investigative Services Technician, whereas Edinger was a counselor and Romig a line officer) and correspondingly different roles in the incident (Danner "allowed inmates from different . . . phases to interact,"[115] whereas, according to the Defendants, Counselor Edinger and Officer Romig simply "escorted the inmates").[116]

As discussed, at the *prima facie* stage of the analysis, Danner "bears the initial burden" of establishing "by a preponderance of the evidence" that similarly situated employees of the opposite sex were treated more favorably.[117] Because she has not presented any evidence substantiating her account of the event at issue, she has failed to meet her burden.

Moreover, even if Danner had established the *prima facie* case, that creates only a "presumption of discriminatory action."[118] The Defendants can rebut that presumption by articulating a "legitimate, nondiscriminatory reason" for the investigation and reassignment.[119] Here, they have done so: the Warden at USP-Lewisburg referred Danner to the BOP's Office of Inspector General based

---

[115]  Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 78.
[116]  Doc. 31 (Defs' Reply) at 5.
[117]  *Sarullo*, 352 F.3d at 797.
[118]  *Id*.
[119]  *Id*.

on allegations that Danner "violated policy and allowed inmates from different . . . phases to interact" without restraints, and reassigned Danner to the Command Center, away from inmates until that investigation was complete.[120]

The burden, then, shifts back to Danner to "establish by a preponderance of the evidence that [the Defendants'] proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action."[121] On this, Danner again fails to meet her burden. She does not deny that the incident occurred or that she was involved; instead, she claims that she "was NOT the ranking officer" and that she "remained in the room [with the unrestrained inmates] for precautionary reasons."[122] But she offers no factual support for either point.

Separately, she points to the timing of various events as proof of pretext: "[t]he fact that most actions taken against Danner occurred after her complaint in September 2015 suggests that Danner's theory is sufficient as a matter of law to establish discrimination."[123] That's incorrect. Danner was reassigned to the Command Center and referred to the Office of Inspector General for investigation

---

[120] Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 78–81; *see also* Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 105:12–21 ("[Q.] Did you reassign [Danner] to the Command Center on time out and deliberate idling on September 3, 2015, as alleged? [A.] She was reassigned by the Warden and the executive staff, yes. [Q.] If so, why was she reassigned? [A.] Until we— the investigation has happened, there was an alleged involvement with inmates, and until we could figure out what was going on we did not want her around inmates.").
[121] *Sarullo*, 352 F.3d at 797.
[122] Doc. 30 (Danner Opp.) at 11.
[123] *Id*.

on September 3, 2015;[124] she filed her initial complaint with Human Resources on September 11, 2015,[125] and her EEO Complaint on September 23, 2015.[126] The relevant employment actions for this theory of liability thus occurred before her complaints of discrimination. The timing of those complaints and whatever events followed do not, as Danner asserts, *ipso facto* prove pretext for prior employment actions.

Accordingly, Danner has failed to offer evidence substantiating her disparate treatment theory for sexual discrimination. Count I cannot proceed on this basis.

### b.   *Quid Pro Quo* Harassment

Claims of *quid pro quo* sexual harassment follow the same *McDonnell Douglas* burden-shifting framework as disparate treatment claims, but the test for establishing a *prima facie* case differs.[127] As the United States Court of Appeals for the Third Circuit explained in *Farrell v. Planters Lifesavers Co.*, "a plaintiff may prove a claim of *quid pro quo* sexual harassment by showing that his or her response to unwelcome advances was subsequently used as a basis for a

---

[124]   Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 78–81.

[125]   Doc. 26-7 (Sept. 11, 2015, T. Danner Letter to USP-Lewisburg Human Resources).

[126]   Doc. 26-6 (Sept. 23, 2015, T. Danner Request for EEO Counseling).

[127]   *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281–86 (3d Cir. 2000) (detailing analytical framework for *quid pro quo* sexual harassment claims); *see also Desouza v. Office of Children and Family Services*, 2019 WL 2477796, at *4 (E.D.N.Y. June 12, 2019) ("Though claims challenging disparate treatment, *quid pro quo* sexual harassment, and hostile work environment are all claims of gender discrimination, they are distinct causes of action governed by different analytical standards.").

decision about compensation, terms, conditions, or privileges or employment."[128] Although the plaintiff "need not show that the submission was linked to compensation, etc., at or before the time when the advances occurred," she must establish that "her response was in fact used thereafter as a basis for a decision affecting . . . her compensation."[129]

Here, Danner identifies the text messages from Lt. Knapp as the "unwelcome advances" underlying this theory of liability.[130] But she does not argue, either explicitly or implicitly, that her "response to" Lt. Knapp's messages (i.e., declining the offered "night cap") was "subsequently used as a basis for a decision about compensation, terms, conditions, or privileges or employment."[131] To be sure, Danner asserts that this message contributed to a "hostile work environment" and that she "suffer[ed] reprisals" for reporting Lt. Knapp's conduct,[132] but those arguments go to different, "distinct causes of action"— namely, gender discrimination based on hostile work environment as well as retaliation.[133] They do not demonstrate that Danner suffered an adverse employment action because she rejected Lt. Knapp's advances.

---

[128]  206 F.3d at 281–82 (internal quotation marks, brackets, and citation omitted).
[129]  *Id*. at 282 (internal quotation marks and citation omitted).
[130]  *See* Doc. 30 (Danner Opp.) at 15 ("[T]he alleged sexual harassment by Mr. Knapp . . . affected a term, condition, or privilege of employment.").
[131]  *Farrell*, 206 F.3d 281–82.
[132]  Doc. 30 (Danner Opp.) at 13–16.
[133]  *Desouza*, 2019 WL 2477796 at *4.

Moreover, even if Danner did advance that argument, she has not presented evidence establishing that any of the alleged adverse "decision[s] about [her] compensation, terms, conditions, or privileges [of] employment" were, in fact, based on her rejection of Lt. Knapp's advances.[134] As the Court sees it, there are three alleged employment actions relevant to this inquiry: (1) Danner's relocation to the Command Center; (2) the investigation into the incident involving unrestrained inmates; and (3) the negative employee evaluations on September 18, 2015.[135] There is no indication, however, that Lt. Knapp was involved in any of those employment actions. And Danner has not presented any evidence that the individuals who were involved in those decisions (for the relocation and investigation, "the Warden and the executive staff";[136] for the negative evaluations, SIA Heath[137]) even knew about the incident between Danner and Lt. Knapp when they made the decisions. By all accounts, they did not.[138]

---

[134] *Farrell*, 206 F.3d 281–82.

[135] To be clear, the Court is not ruling that these three actions are, in fact, the type of "decision[s] about compensation, terms, conditions, or privileges" that give rise to a *quid pro quo* sexual harassment claim. *Id*. Indeed, the Court is skeptical that all three would qualify as such. For example, although Danner received three "Minimally Satisfactory" ratings in September 2015, she received an "Outstanding" rating for the full year 2015. *See* Doc. 26-16 (USP Lewisburg SIS Technician Ratings for 2015). There is no evidence that she suffered any material adverse consequence—to her compensation or any other aspect of her employment—due to the "Minimally Satisfactory" ratings.

[136] Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 105:12–21.

[137] Doc. 26-11 (Sept. 18, 2015, T. Danner Employee Evaluation).

[138] *See, e.g.*, Doc. 26-14 (May 17, 2016, S. Heath Interview Tr.) at 236:24–237:18 (asserting that she was not involved in remediating Danner's complaints about Lt. Knapp and that she didn't "know the dates on that").

Absent any indication that the relevant decisionmakers were even aware of the alleged "unwelcome advances," Danner cannot show that her response to those advances was "used as a basis of" the adverse employment actions at issue.[139] As such, Danner has not established a *prima facie* case of *quid pro quo* sexual harassment.

Further, even if Danner had made a *prima facie* case, this theory of liability would still fail as a predicate for Count I because the Defendants have provided "legitimate, nondiscriminatory reason[s]" for the employment actions, which Danner has not rebutted.[140] As discussed, the investigation into Danner and her corresponding reassignment to the Command Center was based on allegations (which the BOP's Office of Inspector General later substantiated) that Danner allowed inmates to interact without restraints despite policy prohibiting them from doing so.[141] As for the negative performance evaluations, SIA Heath stated that she issued the "Minimally Satisfactory" ratings because Danner failed to store and log Use of Force and incident videos.[142] Indeed, SIA Heath was blunt, stating that Danner received the ratings because she "flat out wasn't doing her job that she's required to do."[143] Danner has not refuted SIA Heath's criticism.[144]

---

[139] *Farrell*, 206 F.3d at 281–82.
[140] *Sarullo*, 352 F.3d at 797.
[141] *See* Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 78–81; *see also* Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 105:12–21.
[142] *See* Doc. 26-14 (May 17, 2016, S. Heath Interview Tr.) at 236:24–237:25.
[143] *Id*. at 237:17–18.
[144] *See* Doc. 29 (Danner Statement of Material Facts).

Therefore, as with disparate treatment, Danner has not established *quid pro quo* sexual harassment as a viable predicate for Count I.

### c.   Hostile Work Environment

To succeed on a hostile work environment claim, an employee must show (1) she suffered intentional discrimination because of her sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability.[145] Courts presented with such claims must be mindful of the Third Circuit's admonition that "Title VII does not create 'a general civility code for the American workplace.'"[146] Accordingly, when "assessing whether conduct is severe or pervasive, courts must consider the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.'"[147] And to that end, the Third Circuit instructs courts to "filter out 'simple teasing, offhand comments, and isolated incidents.'"[148]

---

[145] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

[146] *Kokinchak v. Postmaster General of the United States*, 677 F. App'x 764, 768 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).

[147] *Id.* at 767 (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)).

[148] *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Here, Danner argues that she "clearly perceived the text messages on the trip to Las Vegas to be hostile and abusive," and that those messages, "along with other incidents that occurred at the institution"—specifically, her reassignment to the Command Center, the allegedly "unwarranted investigations" into her workplace conduct, the negative performance evaluation she received, the unwillingness to provide her with psychological assistance, and the "inappropriate sexual remarks" she overheard during her final work week—were "severe enough to create an environment of harassment."[149] Danner contends that she "has provided evidence beyond subjective opinion that management officials took the accepted issue actions based upon the fact that (1) she is a female and (2) . . . she had made an EEO complaint."[150] The Court disagrees.

To start, most of the "incidents that occurred at the institute" do not qualify as acts of intentional discrimination. First, we have Danner's reassignment to the Command Center, the investigations into the inmate incident, and the negative performance evaluations. As discussed, the evidence presented indicates that there were legitimate, non-discriminatory reasons for those actions—reasons Danner has not refuted as pretextual.[151] Moreover, there is no indication that the actions were

---

[149]   Doc. 30 (Danner Opp.) at 14.
[150]   *Id.*
[151]   *See supra* at 25–26, 29–30.

in any way related to one another or that the individuals responsible were aware of the incident involving Lt. Knapp when the actions occurred.[152]

Second, there is the investigation into a possible sexual relationship between Danner and a co-worker. Danner's protestations notwithstanding, the evidence establishes that the alleged investigative steps taken—BOP employees went into Danner's office to look for a video Danner purportedly should have given to the USP-Lewisburg legal department before leaving for the training the Las Vegas, and, after coming across a notebook containing descriptions of sexual acts, they were directed by the Associate Warden to review video footage from the prison and see why Danner was at the facility the previous weekend[153]—were justified. Danner has not presented evidence refuting the Defendants' explanations for why BOP officials were in her office and why they were instructed to review the video footage.[154] Instead, the summary judgment record substantiates the Defendants' account: it appears that the videos Danner failed to provide to the prison's legal department were Use of Force and incident videos; her failure to properly store those videos resulted in the three "Minimally Satisfactory" ratings Danner received on September 18, 2015.[155]

---

[152] *Id.*

[153] *See* Doc. 26-26 (May 17, 2018, A. Hartman Interview Tr.) at 186:6–187:18.

[154] *See* Doc. 29 (Danner Statement of Material Facts) ¶¶ 22–23.

[155] *See* Doc. 26-11 (Sept. 18, 2015, T. Danner Employee Evaluation); Doc. 26-14 (May 17, 2016, S. Heath Interview Tr.) at 236:24–237:25.

Further, there was no formal investigation into the matter or consequence stemming therefrom.[156] After BOP employees reviewed the video footage, the matter was dropped.[157] Accordingly, even if Danner could show that there had been an investigation, she has not established that it detrimentally affected her.[158]

Third, there is the matter concerning the BOP Chief Psychologist.[159] But for this, Danner has not presented any evidence establishing that she was denied services because of either her sex or the EEO Complaint. Instead, Danner cites only an affidavit she prepared for the EEO during its investigation into her complaint, in which she wrote the following: "I believe I was just not important enough for [the Chief Psychologist] to deal with," and "[m]aybe [he] just didn't think a female needed the help."[160] At the summary judgment stage, however, such musings about what another individual may have felt are not enough to sustain a claim, as plaintiffs "cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment."[161]

---

[156] *See* Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 104:22–105:9 (explaining "there was no investigation [into Danner] for having sex with a co-worker" and there was no "referral for one"); *see also* Doc. 26-21 (D. Ebert Affidavit by Interrogatory) at 77 ("21. Did you refer [Danner] for an internal investigation accusing her of having a sexual relationship with a co-worker as alleged? A. No.").

[157] *Id.*

[158] *See Rosati v. Colello*, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015) ("Without negative consequences, [an] investigation alone is not an adverse employment action").

[159] *See* Doc. 30 (Danner Opp.) at 14.

[160] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 36.

[161] *Rosati*, 94 F. Supp. 3d at 714–15 (declining to credit the plaintiff's claim "that she alone received certain extra assignments" and that this was "because of her sex," as she "provides only her deposition testimony to support this claim, and her deposition testimony relies on hearsay").

Apart from those incidents, Danner has presented only two other potential "issue actions": her text exchange with Lt. Knapp, and the sexual remarks she overheard on her final workday.[162] For the text exchange, the Court agrees with the Defendants that this was an "isolated, one-time occurrence" that does not, by itself, satisfy the "severe or pervasive" element of a hostile work environment claim.[163] The message from Lt. Knapp, though unsolicited and unwanted, does not qualify as "severe": Lt. Knapp asked Danner if she wanted a "night cap," Danner responded that she wasn't interested, and then the conversation ended.[164] Danner may well have considered the text messages "hostile and abusive,"[165] but the Court finds that a reasonable person in Danner's position would not have. Indeed, district courts in this circuit have found far more egregious conduct insufficiently severe or pervasive to establish a hostile work environment.[166]

For the sexual remarks Danner allegedly overheard during her last week on the job, Danner's account of the incident lacks corroboration. Danner asserts that "she overheard several staff, some of whom worked in different prisons in the region, in a room adjacent to hers make inappropriate sexual remarks and that she

---

[162] *See* Doc. 30 (Danner Opp.) at 14.

[163] Doc. 31 (Defs' Reply) at 10.

[164] Doc. 26-9 (August 11, 2015, Danner-Knapp Text Exchange) at 115.

[165] Doc. 30 (Danner Opp.) at 14.

[166] *See, e.g., Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439–40 (E.D. Pa. 2001) (finding that four separate incidents—involving "suggestive comments," sexual propositions, and unwanted touching—were not so severe and pervasive to create a hostile work environment, explaining that although the supervisor's "purported behavior is loathsome and inappropriate," the incidents were "sporadic and isolated," spread out over eighteen months).

believed the comments pertained to her."[167] But as proof, she again cites only her EEO affidavit, in which she wrote that the BOP employees speaking "knew I could hear everything they were doing and vice versa," and "[b]eing the only female in the building I knew they were talking about me."[168] The Court is "not required to take into account" such "unsupported assertions, speculation, [and] conclusory allegations."[169]

Moreover, even presuming the validity of Danner's account, she has not proved that the event amounted to anything more than "a mere offensive utterance."[170] There is no evidence demonstrating that this type of sexualized commentary about Danner occurred regularly—indeed, based the facts presented, it appears this was the only such incident.[171] And there is nothing in the summary judgment record connecting this incident to any of the other issue actions alleged. For example, it occurred fourteen months after the text exchange with Lt. Knapp and the inquiry into Danner's possible affair with a co-worker, and there is no indication that Lt. Knapp or anyone involved in the inquiry was among the group of men participating in the crude conversation.[172] Put simply, whether considered

---

[167]  Doc. 29 (Danner Statement of Material Facts) ¶ 31.
[168]  Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 44.
[169]  *Rosati*, 94 F. Supp. 3d at 714–15.
[170]  *Kokinchak*, 677 F. App'x at 767.
[171]  *See id.* at 44–45; *see also* Doc. 29 (Danner Statement of Material Facts) ¶¶ 31–32.
[172]  *See* Doc. 26-20 (T. Danner Affidavit by Interrogatory).

in isolation or alongside the other alleged incidents, the "inappropriate sexual remarks" do not constitute severe or pervasive discrimination.[173]

In sum, the summary judgment record does not support a claim for hostile work environment. Most of the incidents alleged were not discriminatory: some were based on legitimate reasons, unrelated to Danner's sex, whereas others simply lack any factual nexus to Danner's sex or EEO Complaint. And the remaining events are the type of "isolated incidents" the Third Circuit has instructed courts to "filter out."[174] Therefore, Count I cannot proceed on this basis.

## 2.    Retaliation (Count II)

To prevail on a claim for retaliation under Title VII, an employee must prove that "(1) he was engaged in protected activity; (2) he was subject to an adverse job action subsequent to or contemporaneous with such activity; and (3) there is a causal link between the protected activity and the subsequent adverse job action."[175] As with claims of illegal discrimination under Title VII, if an employer articulates a legitimate reason for the adverse employment action, the

---

[173] *See*, *e.g.*, *Rosati*, 94 F. Supp. 3d at 716 (finding that three isolated incidents involving offensive (though not physically threatening or humiliating) comments over a four-month period did not "rise to the level of severe and pervasive discrimination" to establish "a *prima facie* case of a hostile work environment"); *Funayama v. Nichia America Corp.*, 2011 WL 1399844, at *13 (E.D. Pa. Apr. 13, 2011) (granting summary judgment on the plaintiff's hostile work environment claim, explaining that the four harassing incidents—the plaintiff's supervisor allegedly kissed her against her will, suggested they share a hotel room, and asked her out on dates—which occurred over a four-year period, were not "sufficiently severe or sufficiently pervasive" to sustain the claim).

[174] *Kokinchak*, 677 F. App'x at 767.

[175] *Sarullo*, 352 F.3d at 800 (internal brackets omitted).

plaintiff "must [then] produce sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons for [the action] are a pretext."[176]

For the first prong, Danner points to her filing of the EEO Complaint as the protected activity at issue.[177] Such filings do, in fact, constitute protected activity under Title VII.[178] Accordingly, Danner has established this prong of the retaliation test.

For the second prong, Danner does not specify which of the alleged incidents she considers the "adverse actions" at issue in this claim.[179] To ascertain which incidents could apply, the Court separates the prong into its two component parts: timing and action.

As to timing, the alleged adverse actions must have occurred "subsequent to or contemporaneous with" the protected activity.[180] Because Danner filed her EEO Complaint on September 23, 2015, all incidents that occurred before September 23 cannot serve as a basis for this claim. That eliminates several alleged incidents: the inquiry into Danner's possible sexual relationship with a co-worker (early August

---

[176]  *Id.* at 799.
[177]  *See* Doc. 30 (Danner's Opp.) at 13 (arguing that "within days of making her EEO complaint, [she] began to suffer reprisals").
[178]  *See Sarullo*, 352 F.3d at 800 (holding that a plaintiff, by "having filed an EEOC complaint against [his employer] . . . can establish the first prong of [the retaliation] test because he engaged in protected activity").
[179]  *See* Doc. 30 (Danner's Opp.) at 13.
[180]  *Sarullo*, 352 F.3d at 800.

2015);[181] Danner's reassignment to the Command Center and the concomitant referral for investigation based on a prohibited inmate interaction (September 3, 2015);[182] and the negative performance evaluations from SIA Heath (September 18, 2015).[183]

As to action, the Third Circuit has "defined 'an adverse employment action' under Title VII as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"[184] Accordingly, to establish this second prong, a plaintiff must present evidence of a "refusal to hire [or] termination," a "change [in] compensation," or some other "'serious and tangible' alteration of the 'terms, conditions, or privileges of employment.'"[185] To that end, courts have found that negative performance reviews, workplace shunning, rude behavior, and "unnecessary derogatory comments," standing alone, "do not rise to the level of adverse employment action."[186]

---

[181] *See* Doc. 26-7 (Sept. 11, 2015, T. Danner Letter to USP-Lewisburg Human Resources) at 40; Doc. 26-26 (May 17, 2018, A. Hartman Interview Tr.) at 186:6–187:18.

[182] *See* Doc. 26-17 (Sept. 3, 2015, Notification of Change in Work Assignment); Doc. 26-22 (May 17, 2018, J. Fosnot Interview Tr.) at 105:12–21; Doc. 26-21 (D. Ebbert Affidavit by Interrogatory) at 80.

[183] *See* Doc. 26-11 (Sept. 18, 2015, T. Danner Employee Evaluation).

[184] *Storey v. Burns International Security Services*, 390 F.3d 760, 764 (3d Cir. 2004) (citation omitted).

[185] *Jones v. Southeastern Pennsylvania Transportation Authority*, 796 F.3d 323, 326 (3d Cir. 2015) (citation omitted).

[186] *Holt v. Pennsylvania*, 683 F. App'x 151, 158 (3d Cir. 2017); *see also Cherkasky v. Boyertown Area School Dist.*, 2022 WL 612070, at *6–7 (E.D. Pa. Mar. 2, 2022) (finding that neither a "negative performance review" nor an employer's "cold behavior"—without an indication that it prevented the plaintiff "from attending substantive work-related events" or "prevented her

This component of the second prong renders inadequate the remaining potential factual predicates for Danner's retaliation claim. For example, Danner alleges that she received the "cold shoulder" from her supervisor in the Command Center and later overheard co-workers making sexual remarks about her.[187] Even accepting Danner's account of these events,[188] neither constitutes an adverse employment event, as workplace shunning and "unnecessary derogatory comments," without more, do not suffice.

Similarly, Danner's allegations about the Human Resources staff declining to assist her, the prison's Chief Psychologist ignoring her referral, and SIA Heath's refusal to provide her 2016 evaluation, even if accepted as true, "do not rise to the level of adverse employment action."[189] Danner has not presented any argument about what the prison's Human Resources staff or Chief Psychologist were required to do for her and why failing to provide that assistance constituted a "serious and tangible alteration of the terms, conditions, or privileges of [her] employment."[190] She likewise offers no explanation of how, if at all, she was

professional advancement"—qualify as an "adverse employment action"); *Grady v. Cracker Barrel Old Country Store, Inc.*, 2007 WL 1959298, at *11 (July 2, 2007) (Jones, J.) ("Title VII is not intended to cure a cold shoulder or ostracism by co-workers.") (internal quotation marks and citation omitted).

[187] Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 42, 44–45.

[188] Officer Hunter, Danner's supervisor at the Command Center, denies ever ignoring or ostracizing Danner. *See* Doc. 26-24 (May 16, 2018, L. Hunter Interview Tr.) 144:5–23. And, as discussed, Danner account of the incident with her co-workers lacks corroboration. *See infra* at 35.

[189] *Holt*, 683 F. App'x at 158.

[190] *Jones*, 796 F.3d at 326 (internal quotation marks and citations omitted).

affected by purportedly being denied the opportunity to review her annual evaluation.[191]

Further, if the Court could treat these final three incidents as adverse employment actions, it would still be of no moment: Danner fails on the third prong of the retaliation test, as she has not established a causal link between those incidents and her EEO Complaint. For the Human Resources staff, the summary judgment record demonstrates that Regina Moscarello, the Assistant Human Resources Manager at USP-Lewisburg, informed Danner that "once [she] received [Danner's] official written information," their "discussions would be limited"—the two could no longer discuss any "personal issues" because of Danner's active complaint "about work related concerns."[192] Danner has not denied, or offered any evidence repudiating, Ms. Moscarello's explanation.[193] Indeed, there is nothing in the summary judgment record indicating that Ms. Moscarello's actions were instead motivated by or attributable to Danner's subsequent decision to file the EEO Complaint.

For the Chief Psychologist, as discussed, aside from the unsupported assertions and speculation contained in her own EEO affidavit, Danner offers no

---

[191] *See* Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 46.

[192] Doc. 26-25 (R. Moscarello Affidavit by Interrogatory) at 157; *see also* Doc. 26-20 (T. Danner Affidavit by Interrogatory) at 34 ("But, after I sent the [September 11, 2015] memorandum to [Ms. Moscarello] I tried contacting her again and all she would say was because of her position as the Human Resources Assistant Manager, now that I have read the memo I cannot talk about it with you, you understand.").

[193] *See* Doc. 29 (Danner Statement of Material Facts) ¶ 26.

evidence about why the prison's Chief Psychologist did not act on Danner's referral.[194] The record reveals no causal link between the Chief Psychologist's inaction and Danner's EEO Complaint.

And, finally, for SIA Heath's purported refusal to provide Danner with her 2016 employee evaluation, Danner does not even attempt to establish causation. In her Opposition Brief and Statement of Material Facts, Danner simply asserts that SIA Heath "refused to allow [Danner] to see or sign her June 2016 evaluation."[195] Danner makes no factual representation or argument about why this allegedly occurred or how it relates her EEO Complaint.[196]

Accordingly, Danner has not made the preliminary showing required to sustain a retaliation claim. Count II does not survive summary judgment.

---

[194] *See supra* at 33–34.
[195] Doc. 29 (Danner Statement of Material Facts) ¶ 33; Doc. 30 (Danner Opp.) at 19 (same).
[196] *See* Doc. 29 (Danner Statement of Material Facts) ¶¶ 33 –34; Doc. 30 (Danner Opp.) at 11, 19–20.

**IV.    CONCLUSION**

To sustain a claim in federal court for sex discrimination under Title VII, a plaintiff must first file a timely suit after exhausting her administrative remedies and then, after discovery, present evidence from which a trier of fact could find in her favor. Danner has done neither. As such, the Defendants' motion for summary judgment is granted.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge